## MONSON DRAY LINE, INC. v. MURPHY MOTOR FREIGHT LINES, INC., AND OTHERS.

107 N. W. (2d) 850.

February 10, 1961—No. 37,982.

*F. J. O'Brien,* for appellant.

*Stringer, Donnelly & Sharood* and *Henry H. Cowie, Jr.,* for respondents Chicago-Rock Island & Pacific Railway Company and Rock Island Motor Transit Company.

*Mackall, Crounse, Moore, Helmey & Holmes, Perry R. Moore,* and *Clay R. Moore,* for respondent Murphy Motor Freight Lines, Inc.

MURPHY, JUSTICE.

This is an appeal from an order of the district court affirming an order of the Railroad and Warehouse Commission denying the appellant, Monson Dray Line, Inc., a certificate of public convenience and necessity to engage in intrastate operations as a common carrier by motor vehicle of general commodities between the metropolitan area of St. Paul and Minneapolis and Faribault, Minnesota, over U. S. Highway No. 65 and, as an alternate route, over Minnesota Highway No. 218. A petition by Monson to remove a restriction against service by it from the Twin Cities to Faribault imposed in a prior case was also before the commission and was also denied.

Monson asserts that the decision of the Railroad and Warehouse Commission is arbitrary and unreasonable, not justified by the evidence, and contrary to law. It further asserts that the district court erred in failing to reverse the decision of the commission. Monson's application was opposed by the Murphy Motor Freight Lines, Inc., the Chicago-Rock Island & Pacific Railway Company, and the Rock Island Motor Transit Company.

The Monson company, which has its headquarters at Zumbrota, Minnesota, has been engaged in business as a common carrier of freight since 1935. The commission has issued it a number of certificates authorizing service to several points in southeastern Minnesota. A certificate dated May 24, 1948, contains a restriction prohibiting the di-

rect or interline transportation of freight between the Twin Cities metropolitan area and Faribault. Since 1953, however, Monson has in fact engaged in common carrier transportation service between Faribault and the Twin Cities, transporting shipments originating in the Twin Cities and destined for Faribault and the reverse. It has been permitted to do this by reason of a permit issued by the Interstate Commerce Commission authorizing it to engage in interstate commerce over a route which runs from the Twin Cities to Hastings, thence through Wisconsin for a distance of about 28 miles, and then back across the state line to Red Wing, Minnesota, and on to Faribault. It appears to be conceded that the freight Monson now carries which is billed direct to and from Faribault and the Twin Cities is considered interstate transportation because the route used goes through Wisconsin for a short distance. Monson now seeks a new permit which will give it an additional intrastate route between these two points which will be shorter and more direct.

Murphy Motor Freight Lines, Inc., holds certificates of public convenience and necessity over several routes in the state, including the route from the Twin Cities to Albert Lea and Mason City, Iowa. Faribault is one of the intermediate points served on this route. The Murphy line has served this route since 1928.

The Rock Island Motor Transit Company has daily northbound and southbound truck service between Faribault and the Twin Cities. The operation of the Rock Island Motor Transit Company has been the subject of numerous decisions of this court.[1] That company provides direct service on truck billing at truck rates to points which are stations on the Rock Island Railroad. It transports only property tendered to the railroad for shipment; in Faribault a shipper can obtain service from this carrier by calling the Rock Island agent and informing him that he has an l. c. l. shipment to be transported to the Twin

---

[1]Rock Island Motor Transit Co. v. Murphy Motor Freight Lines, Inc. 229 Minn. 291, 40 N. W. (2d) 896; State ex rel. Murphy Motor Freight Lines, Inc. v. District Court, 230 Minn. 560, 42 N. W. (2d) 426; Rock Island Motor Transit Co. v. Murphy Motor Freight Lines, Inc. 239 Minn. 284, 58 N. W. (2d) 723.

Cities. The agent arranges to have the freight picked up by a cartage company at Faribault and taken to the Rock Island depot where it is loaded into Rock Island Transit trucks.

It further appears from the findings of the commission that three contract motor carrier freight lines also serve Faribault 5 and 6 days per week. Fourteen Faribault establishments operate 82 privately owned trucks in the transportation of their commodities to and from the Twin Cities and other points in the state, as well as to destinations throughout the country. It appears also that the larger grocery chain establishments located in Faribault provide their own freight transportation.

Monson applied for a certificate under Minn. St. 221.071,[2] which provides among other things that in considering the issuance of a certificate the commission shall consider (1) the interests of the public that might be affected, (2) transportation service already furnished by any railroad which may be affected by the granting of the certificate, and (3) the effect upon "other transportation service essential to the communities which might be affected by the granting of the certificate." Monson originally applied in 1957 and after a hearing was granted a certificate to serve a route between Rochester and the Twin Cities but was denied an application for intrastate rights between the Twin Cities and Faribault. On February 7, 1958, about 7 months after the denial of its original application, an identical application was filed. It is from an order of the district court affirming the commission's denial of the last application that this appeal is taken.

---

[2]Minn. St. 221.071 provides in part: "If the commission shall find from the evidence that the applicant is fit and able to properly perform the services proposed and that public convenience and necessity requires the granting of the application or any part thereof, a certificate therefor shall be issued. In determining whether a certificate should be issued, the commission shall give primary consideration to the interests of the public that might be affected thereby, to the transportation service being furnished by any railroad which may be affected by the granting of the certificate and to the effect which the granting of the certificate will have upon other transportation service essential to the communities which might be affected by the granting of the certificate."

In attempting to establish that "public convenience and necessity" require the issuance of the certificate to it, Monson produced more than 30 witnesses, all of whom were Faribault shippers. The evidence supporting the application presents the testimony of witness after witness who was in favor of Monson's request. The theme that runs through all of the testimony in behalf of Monson and provides its principal substance is that it would be to the advantage of the Faribault community to have more competition among the various truck operators who serve that community. The evidence fully establishes that Monson gives good service and that it enjoys the goodwill of a large number of Faribault business people and shippers. However, at least 27 of the witnesses testified that Murphy's service was also good. A few voiced complaints as to service given by Murphy in years past, but on cross-examination it developed that these complaints had little substance. Some of the shippers said that they preferred Monson's service because it provided teletype convenience. It appears on the other hand that the Murphy Lines provide the same convenience through Western Union and telephone.

■ It should be noted at the outset that Monson's application for the requested route has had two extended hearings before the Railroad and Warehouse Commission. The present findings of the commission, after full review, have been approved by order of the district court. It should be further noted that Minn. St. 216.25 provides that the findings of the Railroad and Warehouse Commission "shall be prima facie evidence of the matters therein stated, and the order shall be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be on the appellant." In State v. Duluth, M. & I. R. Ry. Co. 246 Minn. 383, 395, 75 N. W. (2d) 398, 407, we said:

"It must be kept in mind also that under our statute the burden rests on the [appellant] to overcome the prima facie reasonableness of the commission's order. We have held that the evidence must be clear and convincing before such order may be set aside by the court."

In the same case we discussed the respective roles of the district court and the supreme court and, after reviewing a number of authorities on the subject, we pointed out that the district court's function is to de-

termine whether the order is reasonable and lawful or whether the commission exceeded its jurisdiction in light of the evidence before it and subsequent evidence received in the district court, so that the question on appeal to the supreme court from the district court's judgment is not whether evidence reasonably sustains the district court's findings, but whether all the evidence submitted to the commission and the district court reasonably sustains the district court's findings on questions of lawfulness and reasonableness of the order.[3]

■ This court has repeatedly held that the issue of public convenience and necessity for the proposed service is one of fact for the Minnesota Railroad and Warehouse Commission. The term "necessity" as used in the statute contemplates "a definite public need for a transportation service for which no reasonably adequate public service exists." State and R. & W. H. Comm. v. Minneapolis & St. L. R. Co. 209 Minn. 564, 570, 297 N. W. 189, 192. In the same case we discussed the term "convenience," observing that the mere fact that a service might be convenient would not meet (209 Minn. 571, 297 N. W. 193) "the requirement of the statute that there must be both public convenience and necessity. Almost every additional service is a convenience. Mere convenience does not satisfy the statute; there must be both public convenience and necessity."

We have carefully examined the record to determine if it supports the conclusion that public convenience and necessity do not require the issuance of the application. We have been unable to find in it evidence which will establish that the shippers of the Faribault community are not now receiving adequate and satisfactory shipping service. The record clearly establishes that the shippers of that community feel that the service which they now receive is satisfactory. It is important to note that the service which is provided by Monson through Wisconsin under Interstate Commerce Commission authority is the same serv-

---

[3]See, also, Twin City Motor Bus Co. v. Rechtzigel, 229 Minn. 196, 38 N. W. (2d) 825; State v. Chicago & N. W. Ry. Co. 246 Minn. 403, 75 N. W. (2d) 411; State and Port Authority of St. Paul v. N. P. Ry. Co. 229 Minn. 312, 39 N. W. (2d) 752; State v. G. N. Ry. Co. 130 Minn. 57, 153 N. W. 247.

ice for which it seeks authority from the Minnesota commission in these proceedings. The only distinction is that Monson seeks to render the same service over highways which lie wholly within the State of Minnesota. The principal point established by Monson's witnesses, and one which we consider to be largely gratuitous, is that more competition among existing carriers provides better service to the community. The fact is that competition already exists. What Monson seeks is a new authorization. While such an authorization would serve Monson's convenience, it has not been established that it would be in the interest of the public. The real aim and purpose of Monson's application is to secure an authorization which will preserve its patronage in the event the Interstate Commerce Commission revokes its present interstate permit.

The foregoing observation is apparent from the testimony of one John Puffer, who was perhaps the most significant witness presented by the applicant. Mr. Puffer is traffic manager for the Nutting Truck and Caster Company at Faribault and is also chairman of the transportation committee of the Chamber of Commerce. His committee made a survey of the traffic needs of the city, and he testified at length on that subject. He expressed the view that the Rock Island service could not be considered on a competitive basis with Monson and Murphy for the reason that the Rock Island service is "a four or five-day operation. It still has to move through a railroad freight house at the Twin Cities." He further testified:

"Well, a competitive situation is always a healthy situation even in transportation providing there is compensatory rate for both, providing there is enough tonnage for both. We believe, and I'm sure that the Traffic Committee concurs with me in that belief, that we need two carriers.

"It's been proven as a fact over the past four years that Monson has operated in here and this tonnage has grown and Murphy tonnage is approximately the same as it has been over the last four years. There hasn't been a great increase or decrease. I think Monson has got it from new industry and tonnage loss by the railroad and definitely we need two carriers."

He also read from a resolution of the traffic committee of the Chamber of Commerce as follows:

"Although the intrastate volume of traffic is small it is an important part of carrier operation into a small community and the Traffic Committee has gone on record as favoring a two-carrier operation into Faribault in order to insure a healthy competitive situation. With the loss of Monson service we would be limited to a one-carrier monopoly with shipments within Minnesota."

This last statement is important in that it expresses the real concern of Faribault people who are in favor of Monson's application. It is apparent from Mr. Puffer's testimony as well as that of other witnesses that Faribault already has "a two-carrier operation" which provides the "healthy competitive situation" they wish to maintain. It further appears that they want the Railroad and Warehouse Commission to issue the additional permit to Monson so as to insure the continued service of two competing motor carriers.

The Railroad and Warehouse Commission has indicated by its findings and order that the holder of a certificate to a certain route is not entitled to immunity from competition under any and all circumstances. However, the issue of competition is not before us for the reason that the Faribault community is already receiving the advantages of competitive service now being furnished by Murphy, by Monson, and, to some extent at least, by the Rock Island Motor Transit Company. Monson's case is predicated on the assumption that it should have the additional permit as insurance against possible adverse action by the Interstate Commerce Commission. We do not think the commission was wrong in holding that public convenience and necessity do not require the issuance of the permit, nor the court, in affirming that determination. The application anticipates an action by the Interstate Commerce Commission which may never occur. If and when the Interstate Commerce Commission revokes Monson's interstate authority, the issue of competition may be material. Under existing conditions we do not think it is.

■ We are of the view that the record supports the conclusion of the trial court that the order appealed from is lawful and reasonable

within the meaning of § 216.25. An examination of the record compels us to agree with the conclusion of the trial judge, who said in his memorandum that he found himself "with no alternative but to hold that the order here appealed from is lawful and reasonable, and that the Railroad and Warehouse Commission's order here appealed from must be affirmed." In addition to the service provided to the community by the Monson route the record establishes that the Murphy line accepts shipments in the Twin Cities destined for Faribault as late as 10 p. m., 5 days per week, with crews available for late calls up to 11:30 p. m. Its truck or trucks carrying Faribault freight arrive there at 5 a. m. for early morning delivery to consignees. It has other truck schedules with freight destined for points south of Faribault, and trucks going to those points are available on their return trip to the Twin Cities for picking up and delivering Faribault shipments going in either direction. The commission observed that Murphy is able to furnish service to a large number of small communities only because of the volume of freight moving to the larger points, such as Faribault, which sustains the overall operation.

The finding of the commission that the shipping needs of the Faribault community are adequately served is supported by the record. Murphy's total daily tonnage intrastate to and from Faribault over a 6-year period was found to be 27,700 pounds, or a normal truckload. Monson carries about 6,815 pounds per day, amounting to approximately one-fourth of a truckload. The commission was of the view that the total tonnage in and out of Faribault is not sufficient to warrant the authorization of an additional regular route common carrier. Monson has not proposed any additional element of transportation service which the community is not now receiving. On the entire record we are forced to conclude, as did the trial court, that the appellant has not carried the burden of overcoming the prima facie reasonableness of the commission's order.

Affirmed.